Richard GAMBILL et al *v.* Dr. Paul T. STROUD

75-80                                   531 S.W. 2d 945

Substituted Opinion On Rehearing

Delivered January 26, 1975

*McMath, Leatherman & Woods,* for appellants.

*Barrett, Wheatley, Smith & Deacon,* for appellee.

JOHN A. FOGLEMAN, Justice. The appellants, the husband and the guardian of Yvonne Gambill, brought this action for damages assertedly resulting from medical malpractice. After an extended trial there was a verdict for the defendant, Dr. Stroud. The principal question on appeal is whether we should modify our prevailing "same or similar locality" rule in malpractice cases, by which a physician, surgeon, or dentist is held only to the standard of competence that obtains in his own locality or in a similar locality. The rule is fully stated in AMI 1501, which the trial judge gave over the plaintiffs' objections. AMI Civil 2d, 1501 (1974).

In discussing the issues of law that are presented we need not describe in detail the serious injuries suffered by

Mrs. Gambill. The appellee and another surgeon were prepared to operate upon the patient in a Jonesboro hospital, for the removal of a thyroid cyst. The operation was not performed because, after the patient had been put under anesthesia, she suffered a cardiac arrest (and later respiratory arrest) that resulted in serious and irreversible brain damage. The plaintiffs' claim against the anesthesiologist was settled before trial. It is not argued that there was no substantial evidence to support the verdict.

The evidence disclosed that Dr. E. B. Sparks, the anesthesiologist who participated, told Dr. Stroud that the patient was ready for surgery, but the procedure was stopped immediately after Dr. Stroud made an incision and found that Mrs. Gambill's blood was "very dark." This blood coloration is indicative of an inadequate oxygen supply in the blood. On the evidence admitted, there was a jury question as to Dr. Stroud's negligence.

Appellants offered the testimony of Dr. James Mayfield and Dr. George Mitchell, Jonesboro anesthesiologists, Dr. Sparks, also of Jonesboro, Dr. Charles W. Quimby, an anesthesiologist who practices and teaches at Vanderbilt University Hospital and Dr. Davis A. Miles, a Little Rock neurologist, who testified that he was familiar with the standards of practice in Jonesboro or similar communities. Dr. Quimby had taught and practiced anesthesiology for five years at the Medical Center in Little Rock, during which time he conducted statewide seminars relating to types and techniques of anesthesia for general practitioners, surgeons, obstetricians and anesthesiologists. He had obtained a law degree from the University of Pennsylvania in 1959. There is no indication that any witness offered by plaintiffs was not permitted to testify, or that any pertinent testimony of any medical witness for plaintiffs was excluded. Appellants state in their brief that it was uncontroverted that the standards of medical practice in Jonesboro, Little Rock and Memphis were comparable. Appellants did not offer any instruction in lieu of AMI 1501. All of the parties tried this case under the same or similar locality rule.

In spite of the failure of appellants to show how they

were prejudiced in the introduction of evidence or to offer an instruction expressing their theory of the proper test of negligence in a medical malpractice case, they did make a specific objection to reference to locality. We might well conclude our discussion on the instruction on the failure to offer a modified or substitute instruction. See *Wharton v. Bray,* 250 Ark. 127, 464 S.W. 2d 554. We consider the objection to support the contention that the locality rule is obsolete. We think, however, that the same or similar locality rule articulately expressed in AMI 1501 is proper, adequate, viable and not unduly restrictive on the evidence a plaintiff may introduce. In spite of its abandonment in some jurisdictions and limitations in others, it may well be the majority rule. See 61 Am. Jur. 2d 239, Physicians & Surgeons, § 116; 70 CJS 950, Physicians & Surgeons, § 43; Restatement of the Law, Torts 2d (1965) 73, § 299A. It has been recently applied in many jurisdictions. See e.g., *Goedecke v. Price,* 19 Ariz. App. 320, 506 P. 2d 1105 (1973); *Peters v. Gelb,* 303 A. 2d 685 (Del. Super. 1973); *Bailey v. Williams,* 189 Neb. 484, 203 N.W. 2d 454 (1973); *Karrigan v. Nazareth Convent & Academy Inc.,* 212 Kansas 44, 510 P. 2d 190 (1973); *Burton v. Smith,* 34 Mich. App. 270, 191 N.W. 2d 77 (1971); *McBride v. U.S.,* 462 F. 2d 72 (9 Cir., 1972).

The thrust of appellants' argument is that the rule set out in AMI 1501 is no longer applicable to modern medicine, because doctors practicing in small communities now have the same opportunities and resources as physicians in large cities to keep abreast of advances in the medical profession, due to availability of the Journal of the American Medical Association and other journals, drug company representatives and literature, closed circuit television, special radio networks, tape recorded digests of medical literature, medical seminars and opportunities for exchange of views between doctors from small towns and those from large cities where there are complexes of medical centers and modern facilities.

However desirable the attainment of this ideal may be, it remains an ideal. It was not shown in this case, and we are not convinced, that we have reached the time when the same postgraduate medical education, research and experience is equally available to all physicians, regardless of the com-

munity in which they practice. The opportunities for doctors in small towns, of which we have many, to leave a demanding practice to attend seminars and regional medical meetings cannot be the same as those for doctors practicing in clinics in larger centers. It goes without saying that the physicians in these small towns do not and cannot have the clinical and hospital facilities available in the larger cities where there are large, modern hospitals, and medical centers or the same advantage of observing others who have been trained, or have developed expertise, in the use of new skills, facilities and procedures, of consulting and exchanging views with specialists, other practitioners and drug experts, of utilizing closed circuit television, special radio networks or of studying in extensive medical libraries found in larger centers.

The rule we have established is not a strict locality rule. It incorporates the similar community into the picture. The standard is not limited to that of a particular locality. Rather, it is that of persons engaged in a similar practice in similar localities, giving consideration to geographical location, size and character of the community. Restatement of the Law, Torts, 2d, 75 Comment g, § 299A. The similarity of communities should depend not on population or area in a medical malpractice case, but rather upon their similarity from the standpoint of medical facilities, practices and advantages. See *Sinz* v. *Owens*, 33 Cal. 2d 749, 205 P. 2d 3, 8 ALR 2d 757 (1949). For example, appellants state in their brief that it was uncontroverted that the medical standards of practice in Jonesboro, Little Rock, and Memphis are comparable. Thus, they could be considered similar localities. The extent of the locality and the similarity of localities are certainly matters subject to proof. Modern means of transportation and communication have extended boundaries but they have not eliminated them. See *Sinz* v. *Owens*, supra; *Tvedt* v. *Haugen*, 70 N.D. 338, 294 N.W. 183 (1940), 132 ALR 379. The opportunities available to practitioners in a community are certainly matters of fact and not law and may be shown by evidence under our own locality rule.

Our locality rule is well expressed in Restatement of the Law, Torts 2d (1965) 73, § 299A, viz:

Unless he represents that he has greater or less skill or

knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

It is fallacious to say that our locality rule permits a doctor in one place to be more negligent than one in another place. It is a matter of skill that he is expected to possess, i.e., the skill possessed and used by the members of his profession in good standing, engaged in the same type of practice in the locality in which he practices, or a similar locality. The similar locality rule prevents highly incompetent physicians in a particular town from setting a standard of utter inferiority for the practice of medicine there. Restatement of the Law, Torts 2d, 75, Comment e, § 299A. See also 3 Sherman & Redfield on Negligence 1532, § 617 (1941).

One of the ideas suggested in appellants' argument is that a national standard of care should be observed. This is also unrealistic. We cannot accept that premise as a matter of law and we certainly do not take the theory that such a standard exists to be so well established that it can be judicially noticed. If it does factually exist to any extent, or in any case, then certainly it can be shown by evidence. If the medical profession recognizes that there are standard treatments, which should be utilized nation-wide this fact should be readily susceptible of proof under the similar locality rule, because the skill and learning should be the same and all localities would be similar.[1] See Annot, 37 ALR 3d 420, 425; *Peters v. Gelb*, 303 A. 2d 685 (Del. Super. 1973); *Rucker v. High Point Memorial Hospital, Inc.*, 285 N.C. 519, 206 S.E. 2d 196 (1974); *Hundley v. Martinez*, 151 W. Va. 977, 158 S.E. 2d 159 (1967). The same may be said for any region exceeding the boundaries of a particular city or town. This is much more likely to be true in cases where a specialist, and not a general practitioner like Dr. Stroud, is involved. See Prosser, Law of

[1]In this very case, appellants' expert witness, Dr. Quimby, was permitted to testify, over the vigorous objections of appellee, that the problems encountered in the Gambill case are specific and unique and that the treatment of such cases is well known and clear-cut and that there was a deviation from this "norm" which was basic whether in New York City or Jonesboro, Arkansas.

Torts (4th Ed.) 164, 166, Ch. 5, § 32; *Naccarato* v. *Grob,* 384 Mich. 248, 180 N.W. 2d 788 (1970); *McGulpin* v. *Bessmer,* 241 Ia. 1119, 43 N.W. 2d 121 (1950). For this reason, cases cited by appellant which involved specialists are of little persuasive weight. After all, in all but the obvious cases of negligence, the question whether the defendant physician has applied that degree of skill and learning which the law requires him to possess is dependent upon medical testimony. *Davis* v. *Kemp* 252 Ark. 925, 481 S.W. 2d 712.

One of the difficulties with the strict locality rule was the tendency to apply it as a rigid, exclusionary rule of evidence, rather than a definition of a standard of care required of a physician. Of course the standard does necessarily have a relationship to the admissibility of evidence. See *Couch* v. *Hutchison,* 135 S. 2d 18 (Fla. App. 1961). But the similar locality rule is not necessarily so restrictive, and an expert witness need not be one who has practiced in the particular locality or who is intimately familiar with the practice in it in order to be competent to testify if the appropriate foundation has been laid to show that he is familiar with the standards of practice in a similar locality, either by his testimony or by other evidence showing the similarity of localities. For examples of such witnesses held competent and testimony held admissible under a similar locality rule, see *Dunham* v. *Elder,* 18 Md. App. 360, 306 A. 2d 568 (1973); *Sinz* v. *Owens,* supra; *Iterman* v. *Baker,* 214 Ind. 308, 15 N.E. 2d 365 (1938); *Kirchner* v. *Dorsey,* 226 Iowa 283, 284 N.W. 171 (1939); *Turner* v. *Stoker,* 289 S.W. 190 (Tex. Civ. App., 1926); *Riley* v. *Layton,* 329 F. 2d 53 (10 Cir., 1964); *Sales* v. *Bacigalupi,* 47 Cal. App. 2d 82, 117 P. 2d 399 (1941); *Dickens* v. *Everhart,* 284 N.C. 95, 199 S.E. 2d 440 (1973).

It is also suggested that modern transportation and communications have so extended the borders of the locality as to bring the physician in a smaller community within the boundaries of a larger community where appropriate treatment may be assured to a patient, even though the physician in the small town be unable to give it because of limited facilities or training. Here again, the appropriate community standard may require that these doctors send such patients as may be

taken to such larger centers,[2] but when this is not practicable, the small town doctor should not be penalized for not utilizing means or facilities not reasonably available to him.[3] This, too, is a fact question which may be inquired into under our similar locality rule. Furthermore, there is nothing in the instruction that limits the locality to the limits of a city. *Lewis* v. *Johnson,* 12 Cal. 2d 558, 86 P. 2d 99 (1939). It may be comprised of a much larger district or area, depending upon the particular facts and circumstances. See *Warnock* v. *Kraft,* 30 Cal. App. 2d 1, 85 P. 2d 505 (1938); *Kirchner* v. *Dorsey,* supra. For e.g., it might be established by evidence that Jonesboro is a part of a locality that also includes Memphis, Tennessee.

It also seems that appellants have overlooked the impact of better medical education, modern technology, and improved means of travel and communication upon the law as it now exists. If the impact is as great as they theorize then no change in the law is necessary. See *Peters* v. *Gelb,* 303 A. 2d 685 (Del. Super. 1973). These factors have already elevated the degree of skill and learning ordinarily possessed and used by members of the medical profession in every locality, if that premise is correct.

It has also been suggested that we should adopt a standard of care and skill based upon that of the "average qualified practitioner" and permit consideration of the medical resources available to the practitioner as a circumstance in determining the skill and care required. Not only would this put a jury in a predicament as to how to arrive at an "average" but it seems to us that requiring the skill of the "average qualified practitioner" automatically makes approximately one-half of the doctors guilty of malpractice. The question is not one of the "average" or "medium" skill, but of the minimum common skill. Prosser, Law of Torts, 165, Ch. 5, § 32. See Restatement of the Law, Torts, 2d, 75, Comment e, § 299A. As pointed out heretofore, the availability of medical resources already has had a bearing upon the question of similarity of localities and, to some

---

[2]See *Tvedt* v. *Haugen,* 70 N.D. 338, 294 N.W. 183 (1940).

[3]We certainly are not unaware of the difficulties experienced by small towns and rural communities in attracting qualified physicians. A complete abolition of the locality rule would certainly add to these difficulties.

extent, upon the establishment of the boundaries of a locality.

As a subordinate contention the appellants argue that the court should not have allowed the jury to take the typewritten instructions into the jury room because these appellants objected to that procedure. The statute requires *only* that the court deliver a copy of the instructions to the jury when counsel *for all parties* so request. Ark. Stat. Ann. § 27-1732.1 (Repl. 1962). That does not mean that any party has an absolute veto power when all parties do not agree. The question is still one falling within the trial court's discretion, as it was before the present statute was adopted. *Rutledge* v. *State*, 222 Ark. 504, 262 S.W. 2d 650 (1953). We find no abuse of discretion in this case.

The judgment is affirmed.

BYRD, J., concurs.

GEORGE ROSE SMITH, JONES and ROY, JJ., dissent.

CONLEY BYRD, Justice, concurring. While I must agree that there is some merit to the minority's criticism of the "same or similar locality" rule, I find that it has become firmly established as part of the law of this State. The rule did not come into our law as the result of an incorrect interpretation of the Constitution of this State or the United States as was the situation in *Parish* v. *Pitts*, 244 Ark. 1239, 429 S.W. 2d 45 (1968), and therefore it is subject to change by the General Assembly. In that situation under Article 2, § 12 of the Constitution of Arkansas this court is prohibited from suspending or setting aside the law with respect to the "same or similar locality" rule. Article 2, § 12 provides:

> "No power of suspending or setting aside the law or laws of the State shall ever be exercised except by the General Assembly."

For the reasons stated, I concur in the majority opinion.

GEORGE ROSE SMITH, Justice, dissenting. This case illustrates the unjust situation that necessarily results from the

"same or similar locality" rule: The plaintiff's difficulty in obtaining expert medical testimony. Here Dr. Quimby, a qualified expert who had taught in medical schools in Arkansas and Tennessee, testified for the plaintiffs. On cross-examination Dr. Quimby admitted that he had not practiced in Jonesboro and was therefore not familiar with the standard of care adhered to by general practitioners in Jonesboro. Defense counsel then repeatedly asked Dr. Quimby, in various forms, what was essentially the same question: "If you do not know what the standard of care in Jonesboro, Arkansas, is, then what is your point of reference, how do you compare it to another locality?" The witness, understandably, could not give an altogether satisfactory answer to the question, despite his unquestioned qualifications as a medical expert. Since AMI 1501 compels the plaintiff to prove his charge of negligence by the same or·similar locality rule, defense counsel were obviously in a position to make a devastating jury argument with regard to Dr. Quimby's testimony.

Such injustice is unavoidable under the rule adhered to by the majority. As a practical matter, a plaintiff simply has no real hope of finding a favorable medical witness whose testimony cannot be seriously weakened by the line of questioning adopted in this case. Thus the local physician obtains a demonstrably unfair advantage. As Prosser observes, the present tendency in the courts is to abandon the same or similar locality rule and, in its stead, to treat the size and character of the community as merely one factor to be taken into account by the jury in applying the general professional standard. Prosser, Torts, p. 167 (3d ed., 1964). I think we should have no hesitancy in taking this opportunity to adopt a rule that is becoming commonplace in other jurisdictions and that is unquestionably fair to both sides in the lawsuit.

ELSIJANE T. ROY, Justice, dissenting. The writer is of the view that the narrow "same or similar locality" rule in malpractice cases has long outlived its usefulness. The tenor of the briefs filed by appellants and appellee both reflect the tremendous advances made in medical science during the last twenty years. The opinion of the majority in this case also recognizes the progress made in the field of medicine.

In *Kolesar* v. *United States*, D.C., 198 F. Supp. 517 (1961), the court pointed out that:

> . . . [T]he locality rule of medical standards was originally formulated when communications were slow or virtually non-existent, and that it has lost much of its significance today with the increasing number and excellence of Medical Schools, the free interchange of scientific information, and the consequent tendency to harmonize medical standards throughout the country. * * *

The North Carolina Supreme Court in *Wiggins* v. *Piver*, 276 N.C. 134, 171 S.E. 2d 393 (1970), stated:

> The "locality rule" (never recognized in England) had its origin in the very old and faraway days when there were many little institutions which called themselves medical schools. Students were admitted who could show a high school diploma or furnish a certificate from a school principal that the bearer had completed the "equivalent" of a high school course of study. At the end of the course, he was given an M.D. degree. Passing the licensing board was in the nature of a formality. In many rural communities, ever thereafter the doctor was on his own. Frequent refresher courses, now generally attended, were unknown. * * *

> Now medical schools admit only college graduates. They are equipped to the highest point of efficiency and turn out doctors who must continue their studies by internships and by actual experience under expert supervision. They continue to study, continue to attend refresher courses, and have access to journals which afford them opportunity to keep them current in the latest treatments and procedures.

It would serve no useful purpose to set out at length the many jurisdictions which have already recognized the need for change and have modified the rule to be applied in malpractice cases.

I agree completely with the comments in the dissenting opinion of Justice George Rose Smith concerning a plaintiff's difficulty in obtaining expert medical testimony under the present rule. Medical science recognizes no geographical boundaries in its broad expanse in the field of progress, and neither should the law place such restrictive impositions upon the rule establishing the degree of skill and care required of medical practitioners.

In criticizing a standard of care and skill based upon that of the "average qualified practitioner", the majority opinion states "[T]he question is not one of the 'average' or 'medium' skill but of *the minimum common skill.*" (emphasis added). In the writer's opinion this was not the test and has never been the test applied in Arknasas. As far back as *Dunman v. Raney*, 118 Ark. 337, 176 S.W. 339 (1915), to our present AMI Civil 2d 1501 (1974), the standard established has been that in treating or operating upon a patient a physician or surgeon must possess, and using his best judgment, apply with reasonable care the degree of skill and learning ordinarily possessed and used by members of his profession in good standing engaged in the same type of practice or specialty in the same or a similar locality to that in which he practices.

In the writer's opinion there is no need to change the standard established by AMI 1501 except to remove the restrictiveness of the "same or similar locality" rule and to give due regard to the medical resources available as one factor in determining the skill and care required of a physician or surgeon. For the foregoing reasons I respectfully dissent.

Justice Jones joins in this dissent.

## Amendment of Rule 11, Rules of Supreme Court

### October 20, 1975

### PER CURIAM

Paragraphs (f) and (g) of Supreme Court Rule 11 are amended to read as follows, effective November 1, 1975:

(f) Appellant's Duty to File Abstract and Brief. — In all felony cases it is the duty of the appellant, whether he is represented by retained counsel, appointed counsel, or a public defender, or acts *pro se,* to abstract such parts of the record, but only such parts of the record, as are material to the points to be argued in his brief. (The former requirement that the Attorney General supply an abstract in felony cases no longer obtains.) The appellant's brief in chief, before its printing, shall not exceed 40 doublespaced typewritten pages, with a similar 10-page limit upon the reply brief, except that if either limitation is shown to be too stringent in a particular case it may be waived by the Court on motion. See paragraph (g) of this Rule with respect to the printing of an indigent's abstract and brief. The State's brief shall be subject to the same page limit.

When the sentence is death or life imprisonment, the Court must review all errors prejudicial to the appellant. Act 333 of 1971; Ark. Stat. Ann. § 43-2725 (Supp. 1973). To make that review possible the appellant must abstract all objections that were decided adversely to him in the trial court, together with such parts of the record as are needed for an understanding of the objection. The Attorney General will make certain that all objections have been so abstracted and will brief all points argued by the appellant and any other points that appear to him to involve prejudicial error.

(g) Printing of Abstracts and Briefs for Indigent Appellants. — When an indigent is represented by appointed counsel or a public defender, his attorney may have the abstract and briefs printed by submitting the double-spaced typewritten manuscript to the Attorney General not later than the due date of the brief.