Jeffrey Todd SPELLMAN, a minor By and Through his mother and next friend, Gloria Gene SPELLMAN, Appellant,

v.

Huston MOUNT, M.D., Individually and Associated Gynecologist, Inc., an Oklahoma Corporation, Appellees.

No. 60730.

Court of Appeals of Oklahoma, Division No. 1.

Oct. 23, 1984.

Rehearing Denied Dec. 11, 1984.

Certiorari Denied March 5, 1985.

Released for Publication by Order of Court of Appeals March 11, 1985.

Oliver & Associates by Larry L. Oliver, Tulsa, for appellant.

Best, Sharp, Thomas, Glass & Atkinson by Joseph M. Best, Joseph A. Sharp, and Patricia K. Lamb, Tulsa, for appellees.

REYNOLDS, Judge:

Gloria Gene Spellman ("mother") went to St. Francis Hospital, Tulsa, Oklahoma, to give birth to her first child on December 5, 1974. Child suffered an injury to his right eye. The opthalmalogist who examined the newborn infant noted a curvalinear bruise extending from above the right eyebrow down across the eyelid of the right eye, some discharge from the eye and a cloudy cornea. Opthalmalogist testified injury appeared to be secondary to forceps manipulation. The bruise was roughly the same configuration of the edge of one of the blades of the forceps used by mother's obstetrician, Huston Mount, M.D. ("Dr. Mount"). It was the opthalmalogist's opinion that the forceps pushed in on the eye, tearing the Descemet's membrane resulting in gross distortion of vision in the child's right eye. The injury to the eye is permanent. Dr. Benson, a board certified obstetrician and gynecologist, testified Dr. Mount was negligent in using the forceps. It was Dr. Benson's opinion that Dr. Mount should have done a cesarean section after a trial of the forceps.

■ At the close of mother's evidence, trial court sustained defendant's demurrer to the evidence. In reviewing a demurrer to the evidence, we examine the record in the light most favorable to the nonmoving party:

> Every fact favorable to the party against whom the demurrer is directed, together with all reasonable inferences which may be drawn from them is admitted as true by the demurrer to the evidence. A demurrer may not be sustained unless there is an entire absence of proof to show any right of recovery.

*Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260 (Okl.1982). All evidence favorable to the movant is disregarded. *Martin v. Stratton*, 515 P.2d 1366 (Okl.1973).

Dr. Mount contends his actions should be judged by the "locality rule" and not by national standards. The locality rule originated at a time when communications were slow or non-existent, thus small town physicians did not have the same opportunities and resources as physicians in large cities to keep abreast of advances in the medical profession. *Pederson v. Dumouchel*, 72 Wash.2d 73, 431 P.2d 973 (1967).

In 1983, the Oklahoma Legislature enacted 76 O.S.Supp. 1983 § 20.1 which provides for a national standard of care:

> The standard of care required of those engaging in the practice of the healing arts within the State of Oklahoma shall be measured by national standards.

Dr. Mount argues that 76 O.S.Supp. 1983 § 20.1 did not become effective until September 21, 1983. Since the actions complained of occurred in 1974, he maintains the locality rule is applicable.

Prior to the enactment of 76 O.S.Supp. 1983 § 20.1, Oklahoma followed an expansive version of the locality rule. In *Runyon v. Reid*, 510 P.2d 943, 950 (Okl.1973), the Oklahoma Supreme Court stated:

> A medical specialist owes a duty to his patient to exercise the degree of skill ordinarily employed under similar circumstances by similar specialist in the field in the same or *similar communities*. [Emphasis added.]

Neither party has presented Oklahoma authority defining the term "similar communities" as applied to the standard of care expected of board certified physicians. Our own research reveals no majority opinion on point. We are guided by a special concurring opinion by Justice Hodges of the Oklahoma Supreme Court in *Zona Gail Ely and Mack R. Ely v. Richard L. Harris*, No. 44,809 (October 30, 1973):

> It is common knowledge that urbanization and technological advances have significantly increased the availability of superior medical information to all practitioners. Because of expanding means of communications and interprofessional information, geographical location of physician's practice is no longer an essential element in determining standard by which a defendant is to be judged, and locality rule has no application to a specialist who is presumed to be acquainted with national standards of his profession. *Christy v. Saliterman*, [288 Minn. 144], 179 N.W.2d 288 (1970). *See also Hundley v. Martinez*, [151 W.Va. 977], 158 S.E.2d 159, 169 (1967).

> \* \* \* \* \* \*

> The locality rule is not recognized by the medical profession. The practice of medicine is carefully guarded by many varied restrictions which involve licensure and board qualification and certification. One who applies for board membership in a medical specialty is not excused if he fails the rigid examinations because he resides in a certain locality. Foreign physicians must pass the boards before they may practice, regardless of their qualifications. One standard is applicable to all applicants. The same is true for the general practitioner who must pass the various state boards before he may be licensed regardless of whether his practice is to be urban or rural. The profession requires a certain standard of medical competence. It is incongruous to hold that rural patients, or patients in a certain locality, are not entitled to the same standard of medical proficiency in

their physicians as those patients in urban or other localities. While it is true that hospital and medical facilities may not be readily available, the degree of knowledge or skill for one engaged in the same strata of the profession should be on an equal plane.

For an analysis of how our sister state of Arkansas has construed the term "similar communities" as applied to the standard of care expected of a physician in his or her particular strata of the profession, see *White v. Mitchell*, 263 Ark. 787, 568 S.W.2d 216 (1978); *Gambill v. Stroud*, 258 Ark. 766, 531 S.W.2d 945 (1976).

Dr. Mount admits he is board certified by the American College of Obstetrics and Gynecology. Evidence at trial indicates those who are board certified must have completed a recognized standard internship and residency in obstetrics and gynecology, practiced this specialty for at least two years, and passed both oral and written examinations. Dr. Mount has specialized in obstetrics and gynecology since he received his medical degree in 1946. At the time of this incident, Dr. Mount had practiced his specialty for twenty eight years and had delivered more than seven thousand babies. He admits the standards for forceps delivery are the same "pretty well the country over". Dr. Ralph C. Benson, the board certified obstetrician and gynecologist who testified on behalf of mother, agrees the standards are the same all over the country.

If the medical profession agrees that there are standard treatments which should be utilized nation-wide by those who have reached the highest level of skill and learning, board certification, then as to these specialists all communities are "similar". We hold that "similar communities", as applied to the standard of care expected of board certified physicians, means a national standard of care. When mother's evidence is viewed in the light most favorable to her, we believe reasonable jurors could conclude there was negligence. We hold trial court erred in sustaining demurrer to the evidence.

Mother also contends sufficient evidence was presented to establish that child suffered brain damage due to Dr. Mount's negligence. In view of the fact that a new trial must be ordered in this case, we deem it unnecessary to address this issue.

Reversed, case remanded for new trial.

REVERSED.

YOUNG, P.J., and ROBINSON, J. concur.